IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NORFOLK SOUTHERN RAILWAY )
COMPANY, )
 )
        Plaintiff, )
 ) CIVIL ACTION NO. 06-58 J
   v. )
 ) JUDGE KIM R. GIBSON
POWER SOURCE SUPPLY, INC., )
 )
        Defendant. )

## MEMORANDUM OPINION AND ORDER

**BACKGROUND**

Power Source Supply (hereinafter Defendant) is a Canadian corporation whose principal place of business is Calgary, Alberta, Canada. Document No. 52 p. 1. It supplies used and rebuilt equipment to the railroad, oil, and gas industries. *Id.* Norfolk Southern Railway Company (hereinafter Plaintiff) is a Virginia corporation with its principal place of business in Virginia; it also operates a locomotive repair facility in Altoona, Pennsylvania. *Id.* at 2.

On July 29, 2004, Defendant faxed to Plaintiff in Altoona purchase order # 222147 for twelve SD40 type locomotives and twenty-four B23-7 type locomotives at a total price of $1,000,000.[1] *Id.*; Document No. 52-2 p. 63. The locomotives had been inspected by Defendant's agent prior to that date. Document No. 52 p. 2. In September of 2004 Defendant requested that ten of the twelve SD-40 type locomotives be supplied with "blue cards."[2] *Id.* Defendant had not previously raised the issue of blue

---

[1] All prices are in U.S. dollars.

[2] The term "blue card" refers to the Federal Railroad Administration's Form FRA 6180-49A, which documents various inspections and tests performed on the locomotives. Document No. 52 p.2. A locomotive must have a blue card before it may legally be used to haul freight. Document No. 52-2 pp. 15, 69-70.

1

cards, and Plaintiff had not factored the cost of obtaining them into the $1,000,000 purchase price. *Id.* at 2-3; Document No. 52-2 at 16-17. Reflecting this latest phase in the Parties' negotiations, on September 13, 2004 Defendant faxed a new purchase order, #222258, to Plaintiff in "Altuna" (sic), in which it offered to pay $1.3 million for the same 36 locomotives described in the previous purchase order provided that ten of the 12 SD40 locomotives had blue cards.[3] Document No. 52 p. 3; Document No. 52-2 pp. 17, 71. There was no firm delivery date, although Plaintiff's representative told Defendant that Plaintiff would "shoot for January 15, [2005]." Document No. 52-2 p. 49.

In November of 2004 Defendant offered to sell WATCO, a start-up railroad company, the 10 blue-carded SD-40s for $140,000 each and the two remaining SD-40s, which were to be used for parts, for $25,000 apiece. Document No. 52 p. 3; Document No. 52-2 p. 75. On January 13, 2005 Plaintiff mailed Defendant a bill of sale reflecting the terms agreed upon in September, 2004, which was then executed by Jamie Crowshaw, President of PSS. Document No. 52 p. 4.

WATCO subsequently relaxed several of its requirements, including that ten of the locomotives be blue-carded, and insisted on a concomitant reduction in Defendant's sale price to $120,000 apiece for six locomotives and $100,000 apiece for four locomotives for a new total of $1,170,000, later reduced to $1,079, 238.80 to reflect various credits unrelated to the sale of the locomotives. *Id.* On February 6, 2005, after further negotiations between Plaintiff and Defendant, Defendant sent Plaintiff in Altoona "Purchase Order # 222258, Revision 1," which reduced the number of blue-carded locomotives from ten to three and reduced the sale price from $1,300,000 to $1,097,500. *Id.* at 5; Document No. 52-2 pp. 87-88. The text of the "Revision 1" order, although not the price, had been

---

[3] The other two SD40s were to be used to "help rebuild" the ten locomotives to be blue-carded. Document No. 52-2 p. 20.

2

"cut and pasted" from the WATCO invoice. Document No. 52 p. 5.

On February 9, 2008, Defendant faxed Plaintiff in Altoona "Purchase Order # 222258, Final Revision," in which Plaintiff further reduced the final purchase price to $1,073,315 to reflect Defendant's provision of additional equipment to be used with the locomotives and in compensation for Defendant's claim that Plaintiff had not met an allegedly agreed-upon delivery deadline. *Id.*; Document No. 52-2 pp. 31-32, 91-92. WATCO paid Defendant in full on February 11, 2005 and Crowshaw executed Plaintiff's final Bills of Sale on February 14, 2005.[4] Document No. 52 p. 5. Plaintiff avers that at the time of delivery, all locomotives delivered to WATCO "were in compliance with the requirements set forth in the Final [Revision] Purchase Order." *Id.* at 6; Document No. 43-3 pp. 11-12.

Defendant subsequently sold all twenty-four of the B23-7 locomotives for a total of $137,500. *Id.*

To date Defendant has paid Plaintiff $289,000. *Id.* Plaintiff filed the instant action on March 13, 2006, pleading breach of contract and in the alternative unjust enrichment and seeking recovery of the remainder of the agreed-upon price. Document No. 1. In its answer Defendant denied liability and made counterclaims for breach of contract, justifiable reliance, breach of express warranty, breach of implied warranty of fitness for particular purpose, and breach of implied warranty of merchantability. Document No. 37, pp. 12-15. Plaintiff filed its motion for summary judgment on October 24, 2007. Document No. 51. Defendant has filed no response to date.

---

[4] One bill of sale was for the locomotives only and a second was for ancillary equipment that was part of the same transaction. Document No. 55-2 pp. 93-96.

## JURISDICTION AND VENUE

The Parties' documents are silent as to choice of law. This action is therefore governed by the United Nations Convention on Contracts for the International Sale of Goods (hereinafter CISG), *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1027 n.1 (2d Cir. 1995) (citing CISG art. 1); *see also Chateau des Charmes Wines, Ltd. v. Sabate USA, Inc.*, 328 F.3d 528, 530 (9th Cir. 2003) (noting that both the United States and Canada are "contracting states to the C.I.S.G."), and the Court has jurisdiction pursuant to 28 U.S.C. § 1331 (granting original jurisdiction over "all civil actions arising under . . . treaties of the United States"). Since the amount in controversy exceeds $75,000 and the Parties are "citizens of a State and citizens or subjects of a foreign state," the Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) since "a substantial part of the events or omissions giving rise to the claim occurred" in the Western District of Pennsylvania.

## DISCUSSION

### Summary judgment

A "principal purpose[] of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . and it should be interpreted in a way that allows it to accomplish [that] purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d. 265, 275 (1986). Fed. R. Civ. P. 56 must therefore "be construed with due regard not only for the rights of persons asserting claims . . . that are adequately based in fact to have [them] tried to a jury, but also for the rights of persons opposing such claims . . . to demonstrate . . . prior to trial, that the claims . . . have no factual basis." *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555, 91 L.Ed.2d at 276. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any

4

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

There is no issue of material fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986) (citation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986), and summary judgment therefore must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d. at 273; *see also J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir. 1987) (holding that a "plaintiff will be out of court if he has not adduced sufficient evidence to get to a jury on every element of his case"). In deciding a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994))

In order to meet its burden, the party moving for summary judgment need not "produce evidence showing the absence of a genuine issue of material fact"; it can instead meet merely "point[] out . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554, 91 L.Ed.2d at 275. The burden on the non-moving party is more substantial. Fed. R. Civ. P. 56(e)(2) states it as follows:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond,

5

summary judgment should, if appropriate, be entered against that party.

As noted above, Defendant has made no response to Plaintiff's motion.

**The contract**

### a. Delivery

The Parties' agreement went through numerous iterations prior to delivery of the locomotives and equipment. Although not required by the CISG, *see* CISG art. 29(1), each of these changes was supported by consideration: when Defendant required ten locomotives to be blue-carded Plaintiff's price went up; when Defendant required that only three locomotives be blue-carded Plaintiff's price went down; when Defendant claimed that Plaintiff was dilatory in its delivery Plaintiff further reduced its price.

It is apparent to the Court that each agreement between the parties superseded the previous agreement. *See Valero Mktg. & Supply Co. v. Greeni Oy*, 242 Fed.Appx. 840, 844-45 (3d Cir. 2007) (finding permissible contract modification under the CISG where a delivery date extension accompanied by a price reduction was agreed to by the parties). None of the agreements included a written delivery date. Under the CISG, delivery is therefore to be "within a reasonable time after the conclusion of the contract." CISG art. 33(c). Defendant, based on Plaintiff's representation on September 10, 2004, that Plaintiff would "shoot for January 15th" as a delivery date, argues that Plaintiff's failure to meet that deadline constituted a breach of the Parties' agreement and therefore Defendant owes Plaintiff nothing and, in fact, Defendant is entitled to recover damages from Plaintiff. Document No. 37 pp. 12-13; Document No. 52-2 pp. 48-49.

Even assuming that the words "shoot for" could create a binding obligation, Plaintiff's final purchase order is dated February 6, 2005, over three weeks after the alleged January 15, 2005 deadline.

6

The CISG requires delivery within a reasonable time after the conclusion of the contract, not before. Since the contract could not have been concluded before the final purchase order was sent, Plaintiff could not have breached by its failure to deliver on January 15, 2005.

### b. Warranties

Defendant has alleged that Plaintiff breached both express warranties and the implied warranties of fitness for a particular purpose and merchantability and argues that it is therefore not only not liable for further payments to Plaintiff but that Plaintiff is liable for damages to Defendant. Document No. 37 pp. 14-15. Whether Defendant's assertions are treated as defenses or counterclaims, Defendant has the burden of showing that the goods Plaintiff delivered did not conform to the terms of the Parties' agreement. *See Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, 408 F.3d 894, 897-98 (7th Cir. 2005). Defendant argues that Plaintiff's failure to tender ten blue-carded SD 40 locomotives, as required by the September 10, 2004 purchase order, was a breach of an express warranty. Document No. 52-2 pp. 51-52. In so doing, however, Defendant ignores the fact that in February of 2005 it sent Plaintiff a superseding purchase order that required that only three of the locomotives be blue-carded, and that this modification of the prior agreement was accompanied by a reduction in price of over $200,000. Defendant has offered nothing to controvert Plaintiff's assertion that three of the locomotives were blue-carded upon delivery.

Defendant also claims that the "[l]ocomotives . . . required $100,000, U.S. dollars, in repairs due to unit deficiencies as compared to the original agreed upon specifications." Document No. 52-2 p. 54. Here, too, Defendant maintains that the original specification included the superseded requirements of the September, 2004 purchase order. Regardless of the specifications involved, Defendant cannot show that it was damaged by this alleged necessity, as it admits that WATCO and

7

not Defendant paid for the repairs and that, at least as of June 14, 2007, Defendant had not reimbursed WATCO.[5] Document No. 52-2 pp. 54-56. Defendant has, moreover, given no explanation as to the nature of the claimed deficiencies or identified the particular locomotives that allegedly required repair even though by the terms of Defendant's final purchase order four of the ten putatively operable SD40 locomotives, Road Numbers 1617, 1609, 1600 and 3179, were being purchased "complete with all major components and . . . as is where is." Document No. 52-2 p. 91. Defendant understood "as is" condition to be "it is what it is"; that "however [the item] shows up on the day [of] delivery, that's it." Document No. 52-2 p. 22. A sale in "as is" condition suggests the possible necessity of repair; it does not exclude it.

Defendant has offered no evidence, either before or after Plaintiff's motion for summary judgment, that would allow a rational trier of fact to conclude that it was more likely than not that the repairs were *not* done to (a) improve the condition of one or more of the "as is" SD40s; (b) to obtain blue cards for any or all of the seven non-blue-carded but putatively operable SD40s described in the purchase order; or (c) because, as suggested by Plaintiff, *see* Document No. 43-3 p. 12, WATCO elected to perform additional maintenance that was not within the scope of the purchase order. Defendant's counterclaims relating to the repairs must therefore fail. Indeed, the information in the record regarding the alleged $100,000 in repairs does not rise above the level of "bare assertions, conclusory allegations, or suspicions," and is therefore insufficient to "show the existence of a genuine issue [of material fact]." *McCabe v. Ernst & Young*, LLP, 494 F.3d 418, 436-37 (3d Cir. 2006) (quoting *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)) (internal citations and

---

[5] Had Defendant reimbursed WATCO at a later date, it could have supplied that information in a response to Plaintiff's motion for summary judgment. Instead, Defendant chose to make no response at all, and the Court must therefore decide the motion on the basis of the unsupplemented record before it.

8

quotation marks omitted).

Regarding the matter of implied warranties, Plaintiff concedes that although the CISG does not specifically include the implied warranties of fitness and merchantability, CISG art. 35 may properly be read to suggest them. Document No. 41 p. 6 & n.3. The CISG also allows, however, for their disclaimer. CISG art. 35(2); John Edward Murray, Jr., Murray on Contracts § 100, at 633 (4th ed. 2001). The last documents to be executed in the Parties' transaction were Plaintiff's bills of sale, which were executed by Defendant on February 14, 2005. They expressly disclaimed all warranties except that of marketable title to the enumerated items with the following language:

> THE EQUIPMENT BEING SOLD ON AN "AS, WHERE IS" BASIS AND WITH ALL FAULTS. EXCEPT AS SET FORTH HEREIN, THE SELLER MAKES NO REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO THE CONDITION OF THE EQUIPMENT, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND EXPRESSLY DISCLAIMS LIABILITY AND SHALL NOT BE LIABLE FOR LOST PROFITS OR FOR INDIRECT, INCIDENTAL CONSEQUENTIAL OR COMMERCIAL LOSSES OF ANY KIND.

Document No. 52-2 pp. 93, 95. The disclaimer was on the second page of each of the two-page documents, in capital letters as above, and in the same font size as the rest of the text.

The validity of the disclaimer cannot be determined by reference to the CISG itself. CISG art 4(a). It is therefore necessary to turn to the forum's choice of law rules. *Geneva Pharm. Tech. Corp. v. Barr Labs.*, 201 F.Supp.2d 236, 282-83 (S.D.N.Y. 2002) *rev'd on other grounds*, 386 F.3d 485 (2d Cir. 2004); *see also Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*, 313 F.3d 385 390 (7th Cir. 2002) (using, in a CISG case involving an Illinois firm, "choice of law principles" to determine that the common law of Illinois applied "to any issues . . . not covered in express terms by the Convention"); *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12-13 (2d Cir. 1996) (applying

9

state choice of law rules to an action brought under the Warsaw Convention).

Under Pennsylvania law, the first step in a choice of laws analysis is to determine whether "there is an actual or real conflict between the potentially applicable laws." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007). Alberta law allows disclaimer of implied terms as follows:

> Where any right, duty or liability would arise under a contract of sale by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties or by usage if the usage is such as to bind both parties to the contract.

R.S.A. 2000, c. S-2, s. 54. Pennsylvania law requires that the disclaimer be "conspicuous" and, if the warranty of merchantability is being disclaimed or modified, the "mention" of the word "merchantability." 13 Pa C.S.A. § 2316(b). Whether a disclaimer is conspicuous is a question of law, to be determined by "whether a reasonable person against whom the modification or exclusion is to operate ought to have noticed it." *Hornberger v. Gen. Motors Corp.*, 929 F.Supp. 884, 889 (E.D. Pa. 1996) (citations omitted). Under Pennsylvania law, factors to consider include: "(1) the placement of the clause in the document; (2) the size of the disclaimer's print; and (3) whether the disclaimer was highlighted or called to the reader's attention by being in all caps . . . ." *Id.* Expressions such as "as is" or "with all faults" are approved by statute as language of exclusion. 13 Pa C.S.A. § 2316(c)(1).

After examining the final, executed bills of sale, Document No. 52-2 pp. 93-96, under the standards set forth above, the Court finds the disclaimer to be valid under either the laws of Pennsylvania or Alberta. There is no conflict, and hence no need for a conflict of laws analysis.[6] *Hammersmith*, 480 F.3d at 230.

---

[6] The Court is aware that the disclaimer also repudiates any express warranties not otherwise set forth in the bill of sale. However, since Alberta's Sale of Goods Act,. R.S.A. 2000, c. S-2 *et seq.*, does not address the disclaimer of express warranties, and since the issue of express warranties could be resolved without reference to the disclaimer, the Court has elected to avoid the further forays into Canadian law necessary to determine whether there is a conflict of law regarding the validity of the bill of sale's disclaimer of express warranties.

10

There remains, however, the question of whether the Final Revision of the purchase order, which does not exclude any warranties for six of the SD 40 locomotives, or the final bill of sale, which excludes implied warranties for all items, is the final manifestation of the Parties' agreement. This battle of the forms must be resolved by reference to CISG art. 19, which reads as follows:

> (1) A reply to an offer which purports to be an acceptance but contains additions, limitations or other modifications is a rejection of the offer and constitutes a counter-offer.
> (2) However, a reply to an offer which purports to be an acceptance but contains additional or different terms which do not materially alter the terms of the offer constitutes an acceptance, unless the offeror, without undue delay, objects orally to the discrepancy or dispatches a notice to that effect. If he does not so object, the terms of the contract are the terms of the offer with the modifications contained in the acceptance.
> (3) Additional or different terms relating, among other things, to the price, payment, quality and quantity of the goods, place and time of delivery, extent of one party's liability to the other or the settlement of disputes are considered to alter the terms of the offer materially.

Since the disclaimer in the bill of sale related to both the quality of the goods and Plaintiff's liability to Defendant, the Court finds that the bills of sale materially altered the terms of the purchase order and that therefore the bills of sale constituted a rejection its terms. The bills of sale instead constituted a counter-offer by Plaintiff which Defendant accepted by its execution of the bills of sale on February 14, 2005. As such, the final agreement between the parties included no implied warranties of any sort.

**Damages**

There is no outstanding issue of material fact in this case. The Court finds as a matter of law that Plaintiff fully performed the final iteration of the Parties' agreement and is entitled to Defendant's full performance in turn. Pursuant to CISG art. 74, which is "designed to place the aggrieved party in as good a position as if the other party had properly performed the contract," *Delchi*, 71 F.3d at 1029

11

(citation omitted), Plaintiff is therefore due the outstanding balance on the contract of $784,315. Plaintiff is not, however, allowed attorneys' fees under Article 74 or any other part of the CISG. *Zapata*, 313 F.3d at 388-89.

CISG art. 78 entitles Plaintiff to prejudgment interest, but the CISG is silent regarding determination of the rate. *Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, 320 F.Supp.2d 702, 715 (N.D. Ill. 2004). United States case law provides little guidance. In *Chicago Prime Packers*, the court focused on its diversity jurisdiction, and applied Illinois' choice of law principles, as it would have in any other diversity case, to determine that the rate should be set by Illinois law. *Id.* at 716 (citations omitted). By contrast, *Guang Dong Light Headgear Factory Co., Ltd. v. ACI Intern., Inc.*, No. 03-4165-JAR, 2008 WL 1924948, 2008 U.S. Dist. LEXIS 35392, at *14-15 (D. Kan. Apr. 28, 2008) treated a dispute governed by the CISG as a federal question and found that the calculation of pretrial interest "rests firmly within the sound discretion of the trial court." In *Delchi Carrier, SpA v. Rorex Corp.*, No. 88-CV-1078, 1994 WL 495787, at *7, 1994 U.S. Dist. LEXIS 12820, at *17 (N.D.N.Y., Sept. 9, 1994), *aff'd in part & rev'd in part by* 71 F.3d 1024, the court, apparently employing the same reasoning as in *Guang Dong*, used its discretion to award prejudgment interest according to the post-judgment rate set by 28 U.S.C. § 1961(a). The Second Circuit affirmed the award of interest without comment. *Delchi*, 71 F.3d at 1031.

This Court will treat the instant dispute as a federal question, which it indisputably is, and apply its "broad discretion" to set a rate of prejudgment interest sufficient to compensate Plaintiff "for the true costs of [the] money damages incurred . . . ." *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 208 (3d Cir. 2004) (citing *Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59, 63 (3d Cir. 1986); *Ambromovage v. United Mine Workers of Am.*, 726 F.2d 972, 981-82 (3d Cir. 1984)). The Court finds

12

that interest at the rate of 6 per cent per annum from the date of breach will be sufficient.[7] So far as the Court can determine, Defendant breached on April 20, 2005, *see* Document No. 52-2 p. 103, and interest will accrue from that day until entry of judgment.

Upon entry of judgment, pursuant to 28 U.S.C. § 1961(a) interest shall accrue "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding" the date of judgment. In the case *sub judice* that rate is 2.21 per cent per annum. Board of Governors of the Federal Reserve System, http://www.federalreserve.gov/releases/h15/data/Weekly_Friday_/H15_TCMNOM_Y1.txt (scroll down to 07/18/2008) (last visited July 22, 2008).

## CONCLUSION

For the reasons given above, Plaintiff's motion for summary judgment will be granted and Defendant's counterclaims dismissed. Damages will be awarded Plaintiff in the amount of $784,315 plus interest at 6 per cent per annum from April 20, 2005 until entry of judgment. Interest at the rate of 2.21 per cent per annum, compounded annually, shall accrue on the total amount of damages from entry of judgment until the judgment is paid. An appropriate order follow

---

[7] This is, coincidentally, the default rate of interest under Pennsylvania law. 41 P.S. § 202. The Court notes that "[u]sing the forum's interest rate is a common choice in CISG cases . . . ." *Chicago Prime Packers*, 320 F.Supp.2d at 716 (citing Tom McNamara, *U.N. Sale of Goods Convention: Finally Coming of Age?*, 32-FEB Colo. Law. 11, 19 (Feb. 2003)).

13

## ORDER

AND NOW, this 25th day of July, 2008, the Court having considered Plaintiff's Motion for Summary Judgment, (Document No. 51), it is **HEREBY ORDERED** that the motion is **GRANTED**.

**IT IS FURTHER ORDERED** as follows:

1. Judgment shall be entered in favor of Plaintiff in the amount of $937,997.76, consisting of $784,315.00, the amount due on the Parties' contract, and $153,682.76 in interest at 6 per cent per annum from April 20, 2005, the date of breach, to July 25, 2008, the date of entry of judgment.

2. Interest on the amount of the judgment shall accrue at the rate of 2.21 per cent per annum, compounded annually, from July 25, 2008, the date of entry of judgment, until the judgment is satisfied.

3. Defendant's counterclaims for breach of contract (Count I), justifiable reliance (Count II), breach of express warranty (Count III), breach of implied warranty of fitness for particular purpose (Count IV), and breach of implied warranty of merchantability (Count V) are **DISMISSED** with prejudice.

4. Plaintiff's Motion to Dismiss Counts II, IV, and V of Defendant's Counterclaims, (Document No. 40), is **DENIED** as moot.

BY THE COURT:

*/s/ Kim R. Gibson/*

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**